ROHMER *v.* LABO.

1. ASSAULT AND BATTERY—ARREST—BREACH OF THE PEACE—ARREST WITHOUT WARRANT—OFFICER'S LIABILITY.

In an action for injuries to plaintiff resulting from being shot by a police officer who arrested him for using profanity and assaulting the officer, it was prejudicial error to charge the jury, in order for plaintiff to have been guilty of a breach of the peace, that what he did and said

must have been done wilfully and knowingly, to warrant the officer in making the arrest. It was incorrect to treat intent and knowledge as controlling elements.

2. SAME—OBSCENITY—CAUSE FOR ARREST WITHOUT WARRANT.
   Plaintiff was responsible for the acts that he committed because the question of intent or knowledge did not enter into them. And where he was intoxicated and so uncontrolled as to be incapable of forming any intent the officer was justified in attempting to make the arrest if the offense was committed in his presence.

3. SAME—APPEAL AND ERROR—EXCEPTION.
   As error may be assigned, under our statute, on the charge, though it was not excepted to, counsel was not required to bring the erroneous instruction to the notice of the trial court.

Error to Wayne; Murphy, J. Submitted January 5, 1916. (Docket No. 27.) Decided March 31, 1916.

Case by Paul Rohmer against John Labo for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Dohany & Dohany,* for appellant.

*Lucking, Helfman, Lucking & Hanlon,* for appellee.

STONE, C. J. This suit was brought to recover damages for an injury which the plaintiff claims to have sustained by reason of a gunshot wound in his left leg, between the ankle and knee, inflicted by the defendant about 10 o'clock of the night of November 30, 1912. On that occasion defendant was the village marshal of the village of Trenton, Wayne county, and plaintiff and several companions were engaged in a conversation on one of the principal public streets in front of the Commercial Hotel in said village. The undisputed evidence shows that the plaintiff was there using obscene language, the exact nature of which was in dispute, the defendant claiming that the language

used was of the most disgusting and obscene character.

The plaintiff had been in the hotel, with companions, drinking, as he claimed, not to exceed two glasses of beer. There was a sharp conflict in the evidence at the trial as to whether plaintiff was intoxicated or not at the time. The plaintiff claimed and testified that he did not know, and was not informed by defendant, that the latter was an officer. This was denied by defendant, who testified that plaintiff knew that he was the village marshal, and that he had been on a former occasion introduced to the plaintiff as such. It was undisputed that at the time the plaintiff had in his hand a quart bottle of whisky, which was sealed. The plaintiff, among other things, testified as follows:

"I did not know who it was that spoke up. The voice came from a point in the doorway, about 20 feet away from me. He says, 'Why God damn you, you have got to cut that out.' I says, 'I am sorry I insulted you, if I did I didn't mean to.' He says, 'It makes no damned difference whether you mean to or not.' I says, 'What occasion have you to control then?' He says, 'That is none of your damn business.' I says, 'All right,' and off I started, off to the boys again, and paid no more attention. I paid no more attention to Labo and we hadn't said any more, no vile words of any kind, just nicely started to talk when he says, 'Here, God damn you, move along'; and he stepped out from the door and came to me and grabbed me right on the shoulder, and turned me half around. I says, 'What authority have you?' He says, 'That is none of your damned business.' I says, 'According to that, then, I don't know that I will move on.' He says, 'You will move on'; and with that he hit me with the heel of his hand under the chin that way (illustrating); I think it was his right hand. I says, 'Friend, you try that again and I think you and I are going to come together, you have no authority to chase me off the public highway and I don't intend to move.' * * * After he hit me on the chin, I says, if he tried that again he and I might come together. With that he came back a second time, struck me with his right

hand, and I noticed in his left hand he had some object of some kind, coming up toward me. As near as I can figure it out he pulled that object from his hip pocket; I actually didn't know what it was; it was dark; I saw a kind of dark object; it occurred to me it might be a billy. It turned out to be a billy. He was hitting me with one hand, and pulling his billy out to hit me with the other, and I reversed my bottle from my right hand to my left hand—which I am left-handed—and I hit him with the bottle. I broke the bottle and I started to run away from him. He came after me; I imagine I had run about 35 or 40 feet, I guess, and I fell; I tripped; I had a big pair of felt boots on, with rubbers, and I could not run very fast, so I fell, and Labo right behind me, on top of me, and he tried to hit me with his billy at the time when I was down, and I kicked him off with my feet. I noticed he had hit my boot very hard with some object; with that I happened by luck to catch him in the stomach, as near as I could judge it, and kicked him, I should judge about 8 or 10 feet, which gave me time to get up. While I was on my back I kicked up at him, I had my feet in the air, to prevent him getting near me with the billy, and he was trying to hit me. I think he broke the billy. I got up finally and ran again, and I imagine I ran about 50 or 60 feet and he came right behind me, he followed up about half way round the circle, as I ran around the post there, and just as I got back on the sidewalk, or very near the sidewalk, I felt something strike me in the leg, and I says, 'Possibly I am shot.' With that I fell, all doubled up, and I heard him say, 'There, damn you, take that.'"

The plaintiff gave testimony showing that the tibia of the leg was broken, and the injury a very serious one; it appearing that the leg is now more than three-quarters of an inch shorter than the other leg. The evidence is undisputed that the plaintiff was disabled for many months and suffered a good deal of pain from the injury.

The defendant, after testifying to the nature of the language used by the plaintiff upon the public street,

which language as described by him is too obscene for publication, testified as follows:

"I says, 'Here, Captain, you have got to cut that kind of thing out, you cannot use that kind of language on the street.' He says, 'What damned business is that of yours?' I says, 'That is what I am paid for, to tell such kind of fellows as you to cut out that kind of language.' I knew Rohmer at that time; I knew him for a short time after I was appointed to the office. He knew I was village marshal. The proprietor of the hotel, Dohlka, gave an introduction to me. * * * After I told him it was my business to see that fellows like him should keep the peace, or refrain from using such language, he says, 'What kind of damned business is that of yours?' I says, 'I am not to ask, I want you to take a walk down the street.' He says, 'That is no damned business of yours.' And with that I put my hand over on his shoulders and gave him a shove, and says, 'You go down the street. He says, 'I don't think of anything why you could make me move'; * * * and I caught him by the coat, and I put my hand in the pocket and pulled a billy out. He says, 'You have a billy here.' I says, 'Yes'; and he struck me over the head with the quart bottle of whisky he had in his hand. I didn't undertake to hit him with the billy; I had hardly got it out of my pocket yet. Up to that time I had not arrested him. I was trying to get him to move along. His condition was what I call disorderly conduct; he was drunk. When he hit me over the head with that quart whisky bottle he knocked me down to my knees. I got up again. As soon as he struck me he started to run; he ran to the north, and he turned to the east around the corner of the hotel. He went about 15 or 20 feet, not over 20, before he fell. He did not trip over anything, there was nothing there to trip over; the sidewalk is just as smooth as that right there. When he fell I got up to him and he was right on his back, and when I got up there he was kicking at me with his feet like that, and I tried to catch him by the collar, and I saw I could catch him by the boot so I struck at him with the billy, and I either struck him on the foot or leg. I only hit him once, and the billy busted. I had concluded to arrest him at that time. I started to arrest him after he

struck me with the bottle. When the billy busted he kicked me in the ditch; his feet hit me right in the breast; it knocked me backwards. There is a ditch, and the ground runs sloping from the sidewalk to the ditch, and when I started backwards I fell down back in the ditch. When I fell Rohmer jumped up and started to run; he ran northwest. I pulled the gun out and shot him; I didn't go 4 feet. I should judge he was about 25 feet away from me then. I shot to stop him. I pointed my revolver right at the ground; the ditch is where I stood; the ditch where I stood is about 2 feet lower than where he was. I wanted to stop him because I wanted to get him to make an arrest."

We have quoted from both plaintiff's and defendant's testimony somewhat at length to show the conflict in the testimony relating to the occurrence. It will be noted that the plaintiff had testified that he was not drunk at the time of the trouble. The trial resulted in a verdict and judgment for the plaintiff for $2,000 damages.

The defendant has brought the case here upon writ of error and there are six assignments of error, only three of which it will be necessary for us to consider—the third, fourth, and fifth:

(3) The court erred in charging the jury as follows:

"In approaching a study of the facts, in analyzing this testimony in order that you may find out what actually happened that night, you are going to be confronted with this legal question: Was a breach of the peace being committed by the plaintiff, Rohmer, at the commencement of the difficulty? Now, to answer that question properly, you have to know what, in law, amounts to a breach of the peace. A breach of the peace consists in any wilful, unjustifiable disturbance of the public peace, anything which amounts to a wilful, unjustifiable disturbance of the public peace is a misdemeanor, a criminal offense."

(4) The court erred in charging the jury as follows:

"Examine this testimony then, and ascertain at the

outset here, upon the occasion in question, was the plaintiff committing knowingly, wilfully, an unjustifiable disturbance of the public peace? If he was, he was committing a criminal offense."

(5) The court erred in following the above-quoted charge with the following language:

"If, on the contrary, after an examination of the evidence here, you determine that no breach of the public peace was being committed upon the occasion by the plaintiff, then the defendant would have no right whatever to interfere with the plaintiff."

Near the close of the charge of the court the following occurred:

The court asked defendant's counsel if he had anything to suggest in the case, to which defendant's counsel replied:

"No, your honor."
*"The Court:* I covered the legal principles as to the right of the defendant to exercise his authority in making an arrest."
*"Defendant's Counsel:* Yes, your honor."
*"The Court:* And the theories presented by the defendant on the facts of the case."
*"Defendant's Counsel:* Yes, your honor."

That peace officers have a right to arrest for breaches of the peace committed in their presence in a public street is not denied. The third, fourth, and fifth assignments of error may be treated together. We have read the entire charge with a good deal of care, and are of opinion that there was reversible error in the portion of the charge upon which error is assigned, which, in all probability, affected the verdict in the case. As we understand this portion of the charge, it was to the effect that, in order for the plaintiff to have been guilty of a breach of the peace, what he did and said must have been done wilfully and knowingly by him, in order to warrant the officer in making an

arrest; and we do not find that this portion of the charge was cured in other parts thereof.

It is undisputed that defendant was a peace officer, and as such would have the right to arrest the plaintiff for the use of grossly indecent language used upon a public street in the presence of such officer, and for an assault upon the officer there. Such conduct on the part of the plaintiff, as testified to by defendant, was against decency and public morals, and would justify the officer in making an arrest. This court has defined a breach of the peace in *Davis* v. *Burgess*, 54 Mich. 514 (20 N. W. 540, 52 Am. Rep. 828).

It has been held that it is competent for a peace officer to take into custody even an insane man who is committing a breach of the peace in his presence. *Lott* v. *Sweet*, 33 Mich. 308; *Van Deusen* v. *Newcomer*, 40 Mich. 90-142. The fact that the person is insane does not exempt him from liability to arrest if he commits a breach of the peace which would be an offense if committed by a sane person. 22 Cyc. p. 1214, and cases cited.

The infirmity in the charge is that it made the intent and knowledge with which the breach of the peace was committed the controlling element. In our opinion the plaintiff was liable for the acts which he had committed, because the question of his intent or knowledge did not enter into the acts. The use of vile and obscene language upon the street and an assault upon an officer by a person so intoxicated and wild that he was not capable of forming an intent, would justify the officer in making an arrest if committed in his presence. The jury in this case may well have found under the charge that the plaintiff was guilty of a breach of the peace by the use of indecent language upon the public street, in the presence of the officer, and of an assault upon the officer, and yet because of his drunkenness, the defendant was not justified in arresting him. In our

opinion the language of the court complained of probably led the jury to return a verdict for the plaintiff in the substantial sum indicated.

. Referring to the colloquy between the court and defendant's counsel near the close of the charge, it should be borne in mind that error may be assigned upon any part of the charge, although not excepted to. The statute permitting this practice has been criticized by this court in the following cases: *Just* v. *Porter,* 64. Mich. 565, 568 (31 N. W. 444) ; *Totten* v. *Totten,* 172 Mich. 565, 580 (138 N. W. 257) ; *Cookes* v. *Lymperis,* 178 Mich. 299, 303 (144 N. W. 514). But, notwithstanding such criticism, the statute has been followed in many cases, and it is our opinion that defendant's counsel was not obliged to point out to the court the error in the charge relied upon.

This view of the case renders it unnecessary to consider the other assignments of error, which relate to matters not likely to occur upon another trial.

For the error in the charge above pointed out, the judgment of the court below is reversed, and a new trial granted.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.